BRIAN J. STRETCH (CABN 163973)
United States Attorney

BARBARA J. VALLIERE (DCBN 439353)
Chief, Criminal Division

SCOTT D. JOINER (CABN 223313)
Assistant United States Attorney

 450 Golden Gate Avenue, Box 36055
 San Francisco, California 94102-3495
 Telephone: (415) 436-7200
 FAX: (415) 436-7234
 scott.joiner@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) NO. CR 13-00194 JSW |
|     Plaintiff, | ) NO. CR 17-00050 JSW |
| | ) |
|  v. | ) **UNITED STATES' SENTENCING** |
| | ) **MEMORANDUM** |
| ANTWON GRAHAM, | ) |
| | ) Sentencing Date: October 3, 2017 |
|     Defendant. | ) Time:     1:00 p.m. |
| | ) Judge:    Hon. Jeffrey S. White |

## I.    INTRODUCTION

The defendant, Antwon Graham, stands before the Court to be sentenced following his guilty pleas to Count One of the Indictment in Case No. CR 17-00050 (felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1)) and all seven charges filed against him in the U.S. Probation Amended Form 12 dated March 23, 2017, in Case No. CR 13-00194.  Given the defendant's persistent and escalating criminal history, and his demonstrated danger to the community, the government respectfully requests that the Court impose a custodial sentence in Case No. CR 17-00050 of 92 months in prison to be followed by three years of supervised release, an expanded search condition as stipulated to by the parties in the plea agreement, forfeiture of the firearm and ammunition involved in the offense, and a mandatory special assessment of $100.  In addition, pursuant to the plea agreement, the government recommends that the defendant serve an additional 12-month custodial sentence for his violations of supervised release in Case No. CR 13-00194, for a total sentence of 104 months in prison.

## II.   OFFENSE CONDUCT (PSR ¶¶ 1-15)

### A.    December 7, 2016 Possession of Firearm and Ammunition

On December 7, 2016, at approximately 0700, Oakland Police Department (OPD) Officer William Bergeron began surveillance in the 300 block of W. McDonald Way in Richmond, CA.  He was working undercover.[1]  OPD officers were conducting surveillance in the area in order to locate and arrest Ghost Town gang member Taza CORRAL.  CORRAL was subject to outstanding felony arrest warrants for burglary and possession of a firearm.  At the time there was an ongoing internal Ghost Town feud that had resulted in at least four murders and several shootings in the preceding weeks.  OPD believed CORRAL was involved.

At approximately 0940, Bergeron saw a black Dodge Dart stop along the north curb facing westbound in the 300 block of W. McDonald Way. He then saw an individual, later identified as Trevon COLLINS, exit the vehicle via the drivers' side door and walk to the passenger side of the vehicle.  At the same time another male, who he recognized as Taza CORRAL, walked southbound from the north sidewalk area towards the driver's door of the Dodge. CORRAL entered the Dodge via the driver's side

---

[1] The following facts are taken from the PSR and the relevant police reports, which are attached as Exhibits A and B.

1   door and COLLINS entered via the right front passenger door.  The vehicle left the area, going west on

2   W. McDonald Way then south on Richmond Pkwy.

3       Along with Sgt. Babka, Off. T. Chu, and Off. B. Pappas, Bergeron followed the vehicle to the

4   2400 block of 62nd Ave. in Oakland, CA, where the car parked along the east curb facing north. Nobody

5   got out of the vehicle after it parked.  At approximately 1015, Bergeron saw a green Nissan van turn

6   north onto 62nd Ave from Avenal St and park behind the Dodge.  At that point an individual who he

7   recognized as Antwon GRAHAM got out of the van and got into the Dodge via the driver's side rear

8   passenger door.  As GRAHAM walked to the Dodge, Bergeron saw that he was holding his right arm

9   stiff along the right side of his body with his right hand down at the bottom edge of his jacket. It

10  appeared as though GRAHAM was holding the bottom of the jacket down against his side. Bergeron

11  also saw what he thought was the outline of a long object along GRAHAM's right side.  GRAHAM also

12  had an outstanding parole violation warrant for his arrest.

13      Officers followed the vehicle to the 5600 block of San Pablo Avenue, Oakland, CA, where

14  GRAHAM, CORRAL, and COLLINS got out of the car and went into the One 4 All Hair Salon (5655

15  San Pablo Ave.).  At approximately 1100, the undercover team advised a uniformed OPD arrest team of

16  the suspects' location.  After establishing a perimeter, Officers Gallinatti, Fajardo, Hraiz, Berger,

17  Brothers, Johnson, Sgt. A. Jones, and Sgt. R. Vierra were designated as the arrest team to enter the

18  salon.  They found all three suspects sitting inside the salon and took them into custody without incident.

19      Officer Berger placed GRAHAM under arrest and searched his person.  He found a .40 caliber

20  Glock, model 27 (serial # WYW001), in the front of GRAHAM's waistband. The firearm was loaded

21  with one round in the chamber and 12 rounds in the magazine.  Officer Berger also found a 31-round .40

22  caliber magazine, loaded with 19 rounds, in GRAHAM's front left pocket of his pants.

23      CORRAL and COLLINS were also armed.  Officers found a loaded .357 caliber Glock, model

24  32, in CORRAL's waistband, and a loaded .9mm Glock, model 26, in COLLINS' jacket pocket.

25  Officers then conducted a probable cause search of the Dodge Dart.  In the car they found a partially

26  empty 50-round box of .357 ammunition in the front passenger seat, and a 50-round 9mm drum

27  magazine on the floor board.

28

**B.      Possession of Two Additional Firearms on October 12, 2016 (Burlingame, CA)**

On October 12, 2016, at approximately 6:09 PM, Officer Tristan Holsgrove was detailed to Go Kart Racer, located at 1541 Adrian Rd., to investigate a fraud report.  The reporting party stated that a black male adult by the name of Antwon GRAHAM, was on scene to pick up his driver's license.  The individual recognized GRAHAM as the same subject who came into his business on September 3, 2016, and used fraudulent credit cards to purchases credit for additional race time.  In that incident, GRAHAM left his identification card behind.  After the officer arrived, the reporting party told him GRAHAM was inside with three other individuals.  Another officer, Officer Hutchings, arrived shortly after that and the two officers made contact with the four individuals identified by the reporting party.

The four individuals were playing pool in the back.  Two males standing at the pool table provided Officer Holsgrove with their CA identification cards: identifying themselves as Kenya Harris and Javlin County. The other two males were seated on the couch and said they did not have identification.  Instead they verbally identified themselves as Layshawn Brown and Michael Smith (later identified as Antwon GRAHAM and Delay Graham through booking and California identification photographs).  While the officers were speaking to the four individuals about the reason for the police contact, they began providing different stories as to why they were at Go Kart Racer.  None of them was willing to admit that they had contacted the reporting party and asked for their identification card back.  When Officer Holsgrove first contacted the four subjects, two of them (Antwon GRAHAM and Delay Graham) were seated on the couch with a black backpack between them.  The two subjects who provided ID cards (Javlin County and Kenya Harris) were standing and apparently playing pool.

Things began to deteriorate from there.  All four individuals began preparing to flee from the outnumbered officers.  Delay Graham asked if he could use the restroom.  The officer told him he could not because he was being detained for investigation into credit card fraud.  Antwon GRAHAM repeatedly stood up from the couch despite multiple instructions to remain seated and not move around. The four subjects began whispering among themselves and moving around after they had been instructed to sit down and stop talking to each other.  While the two officers continued to try to identify Antwon GRAHAM, all four subjects stood up and took off running at the same time.  The officers were outnumbered and caught flat-footed.  All four suspects made it out of the business and began running in

1 separate directions.  As described below, BPD was only able to apprehend one of the four (despite

2 assistance – including K9 and air support from multiple adjacent law enforcement agencies).

3       After scuffling with Antwon GRAHAM unsuccessfully (GRAHAM escaped), Officer Holsgrove

4 picked himself up off the ground and turned to see Kenya Harris now leaving the business with two

5 backpacks.  (Later review of surveillance video showed that Harris ran at first, but then returned to

6 retrieve two backpacks from the business).  Holsgrove gave chase.  As Harris fled south on Adrian

7 Road, however, Harris fell and dropped the backpacks at the corner of Adrian Rd. and David Rd.  He

8 then hopped the cyclone fence to Highway 101 and fled on foot eastbound across all lanes of traffic.

9 (BPD later found him hiding in a dumpster).  Holsgrove returned to collect the backpacks.  He looked

10 into both bags and found two black semi-automatic handguns in each one.

11       BPD then reviewed the surveillance video, which showed that Antwon GRAHAM was carrying

12 the black backpack when he entered the business.  More specifically, BPD's review showed that at

13 approximately 6:03 PM, Antwon GRAHAM walked to the counter of the store and conversed with the

14 clerk.  The three other suspects proceeded into the business out of the view of the cameras.  During the

15 contact with Officer Holsgrove and Officer Hutchings the subjects simultaneously stood up and ran

16 towards the front door. Three suspects initially ram northbound on Adrian Road and one ran southbound

17 on Adrian Road.  Suspect Kenya Harris later returned to the business, ran inside, and grabbed the two

18 backpacks he and Antwon Graham were wearing moments earlier.  As Kenya Harris left the store he

19 began running southbound Adrian Road.

20       Inside the black backpack (carried by GRAHAM on surveillance video and seen on the couch

21 next to him by Holsgrove), BPD found two semi-automatic firearms: one Glock 26, 9 MM (Serial #

22 UYE543) loaded with 11 rounds of ammunition, including one in the chamber; and one Springfield

23 Armory XD-40, .40 caliber (Serial # XD335198) loaded with 12 rounds.

24 **III.  SENTENCING GUIDELINES CALCLATIONS**

25       The government concurs with the PSR's Guidelines calculation which results in a total combined

26 offense level of 23.  The defendant's prior felony and misdemeanor convictions score him sixteen (16)

27 criminal history points, resulting in a Criminal History Category (CHC) of VI.  The Guidelines range for

28 an offense level of 23 and CHC VI is 92-115 months in prison.

**IV.     DISCUSSION**

**A.     Applicable Law**

Section 3553(a) directs the district court to consider a number of factors in determining an appropriate sentence.  In this case, these factors indicate that a sentence of 92 months for Count One (plus 12 months for his separate violations of the terms of his supervised release) is sufficient, but not greater than necessary, to achieve the goals of sentencing.  *See United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008).  The key factors are the nature and circumstances of the offense and the history and characteristics of the defendant, 18 U.S.C. § 3553(a)(1), the need to afford adequate deterrence to criminal conduct, *id.* § 3553(a)(2)(B), the need to protect the public from further crimes of the defendant *id.* § 3553(a)(2)(C), and the need to impose a just punishment, *id.* § 3553(a)(2)(A).

Although the Supreme Court's decision in *Booker* rendered the Sentencing Guidelines advisory, the Guidelines still remain the "starting point and initial bench-mark" for sentencing.  *Kimbrough v. United States*, 552 U.S. 85, 108, (2007) (internal quotation marks and citation omitted); *see Carty*, 520 F.3d at 991 (en banc); *United States v. Ellis*, 641 F.3d 411, 415 (9th Cir. 2011).  While there is no presumption of reasonableness for a Guidelines range sentence, if a district judge "decides that an outside-Guidelines sentence is warranted, he must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance."  *Carty*, 520 F.3d at 991-992 (citing *Gall v. United States*, 552 U.S. 38, 50, (2007)); *see also United States v. Munoz-Camarena*, 631 F.3d 1028, 1030 (9th Cir. 2011) ("district court must start with the recommended Guidelines sentence, adjust upward or downward from that point, and justify the extent of the departure from the Guidelines sentence.").  As the Supreme Court recognized in *Gall*, "a major departure should be supported by a more significant justification than a minor one."  552 U.S. at 50.  Finally, "[a]s a general rule, the preponderance of the evidence standard is the appropriate standard for factual findings used for sentencing."  *United States v. Armstead*, 552 F.3d 769, 777-78 (9th Cir. 2008); *see, e.g.*, *United States v. Treadwell*, 593 F.3d 990, 1001 (9th Cir. 2010).

/ /

/ /

/ /

**B.      Sentencing the Defendant to 104 Months' Imprisonment Would Vindicate the Interests Set Forth in 18 U.S.C. § 3553(a).**

The defendant's criminal history spans most of the last decade.  His criminal history is remarkable not only for its longevity, but also for the frequency and regularity of arrests and convictions.  This is not the defendant's first conviction for an offense involving firearms.  (*See* PSR ¶¶ 32-38.)[2]  The defendant's most recent federal conviction – for being a felon in possession – resulted in a custodial sentence of 21 months and six years of supervised release.  (*Id.* ¶¶ 35-36.)  His recent state conviction for assaulting a police officer with a firearm resulted in a prison sentence of three years.  (*Id.* ¶ 37.)  Those punishments, like the ones before them, had no impact on the defendant's criminal conduct.  Despite multiple encounters with the criminal justice system from a young age, and opportunities to reform, the defendant's criminal conduct has continued unabated and undeterred by numerous arrests, convictions, and periods of incarceration.  (*See* ¶¶ 32-38, 44-48.)  During approximately eight years spanning April 2008 to February 2016, the defendant accumulated eight felony and one misdemeanor conviction, as well as at least four additional arrests.  (*Id.*)  The frequency and continuous nature of the defendant's felonious conduct and arrest record are even more remarkable when compared against numerous periods of incarceration and judicial supervision during the same timeframe.

A substantial sentence is now required protect the public and impress upon the defendant the need to refrain from future criminality.  Despite multiple approaches to rehabilitation over the last decade, no sentence and no amount of supervision has come close to protecting the community or earning the defendant's respect.  His current conviction and admission now includes two offenses of being a felon in possession of a firearm.  The current offenses occurred within two months of each other. In each offense the firearm the defendant was carrying was loaded.  In December of 2016, he was arrested with two other armed Ghost Town gang members in the midst of bloody and deadly gang feud

---

[2]      This memorandum does not repeat the detailed facts surrounding the defendant's previous convictions and arrests as described in the PSR.  The government notes the serious nature and extended pattern of these offenses, however, and urges the Court to give them careful consideration when evaluating the defendant's criminal history.

that had resulted in at least four murders and several shootings in the preceding weeks.  The defendant himself was carrying a spare magazine in his pocket.  The magazine had the capacity to hold 31 rounds and was loaded with 19 bullets.  In the car in which the defendant had been riding, officers found a 50-round 9mm drum magazine.

Given the defendants escalating criminal history, his past violent conduct, and his arrest with other armed gang members (in possession of an arsenal of weapons) the government respectfully submits that a combined 104-month term of imprisonment would be sufficient, but not greater than necessary, to achieve the goals of sentencing.

For the same reasons, the government recommends that the Court impose a three-year term of supervised release with a special search condition as set forth in the plea agreement:

> The defendant shall submit his person, residence, office, vehicle, electronic devices and their data (including cell phones, computers, and electronic storage media), and any property under defendant's control to a search.  Such a search shall be conducted by a United States Probation Officer or any federal, state, or local law enforcement officer at any time, with or without suspicion.  Failure to submit to such a search may be grounds for revocation; the defendant shall warn any residents that the premises may be subject to searches.

Given the defendant's persistent criminality and his demonstrated unwillingness and/or inability to comply with the law and court orders, the requested search condition is needed to serve the interests of deterrence and rehabilitation.

### C.    The PSR's Recommended Sentence Fails to Satisfy the Goals of Sentencing.

The government believes that the recommendation in the PSR misses the mark.  In the plea agreement, the parties sought to limit the defendant's exposure on a consecutive sentence to twelve months. Without such an agreement, the defendant would be facing the possibility of two consecutive sentences of 92-115 months.  But the PSR uses that agreement to recommend a sentence – for a single offense - that would fall below the Guidelines.  This recommendation has the perverse effect of granting the defendant a benefit for committing multiple offenses.  Rather than properly account for multiple offenses, the PSR simply reduces the low-end sentence by twelve months because the defendant is also facing punishment for a separate offense.  In doing so, the PSR mistakenly places the defendant on equal footing with other defendants who committed a single offense and otherwise merit a low-end or below-Guidelines sentence.  Such a recommendation creates a serious risk of inconsistent sentences and

completely ignores the defendant's repeated criminal conduct and the nature of the current offenses. There is nothing in the defendant's history or the facts of the present offenses that would warrant a below-Guidelines sentence.  To the contrary, the twelve-month consecutive sentence for the defendant's violation of supervised release (by possessing a firearm and committing fraud) should have little to do with whether a below-Guidelines sentence is appropriate for the separate and distinct offense charged in Count One of the Indictment (possessing a loaded firearm two months later).  The opposite should be true.  Rather than support a below Guidelines sentence, the fact that the defendant committed two firearms-related violations in less than two months – in the midst of a bloody and deadly gang feud – instead supports a sentence at the higher end of the Guidelines.  Make no mistake; the defendant earned every single one of his criminal history points.  It would not be a just punishment to sentence him below Guidelines simply because he also pled guilty to violating the terms of his supervised release on a separate occasion.[3]

## V.      CONCLUSION

In full consideration of the defendant's history and characteristics together with the goals of sentencing, the government respectfully requests that the Court sentence the defendant to a combined 104 months in prison.  The government recommends that this term in custody be followed by three years of supervised release, the search condition set forth in the plea agreement, a $100 special assessment, and forfeiture of the firearms and ammunition involved in the offenses.

DATED: September 26, 2017                     Respectfully submitted,

                                              BRIAN J. STRETCH
                                              United States Attorney


                                              _____/s/_____
                                              SCOTT D. JOINER
                                              Assistant United States Attorney

---

[3] This approach might make more sense if the violation of his supervised release was the same offense to which he was pleading guilty in the Indictment.  But as described above, the two offenses were completely separate.  One should not reduce the gravity of the other.